JEROME GROSSMAN AND MARILYN GROSSMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Grossman v. Commissioner
Docket No. 10994-89
United States Tax Court
T.C. Memo 1994-231; 1994 Tax Ct. Memo LEXIS 231; 67 T.C.M. (CCH) 3001; May 24, 1994, Filed *231 For petitioners: John J. O'Toole and Stanley Rier. For respondent: Elizabeth P. Flores. WHALEN
WHALEN
MEMORANDUM FINDINGS OF FACT AND OPINION WHALEN, Judge: Respondent determined the following deficiencies in, and additions to, petitioners' Federal income tax: Addition to Tax Year
Deficiency
Sec. 6653(b)
1978
$ 18,713
$ 9,357
1979
34,160
17,080
1980
18,011
9,006
All section references are to the Internal Revenue Code in effect for the years at issue. After concessions, the issues for decision in this case are: (1) Whether petitioners underreported their taxable income for 1978 in the amount of $ 46,093.76, as determined in the notice of deficiency; (2) whether petitioners underreported their taxable income for 1979 by failing to include a dividend of $ 14,350 from their wholly owned corporation, Flomar Realty, Inc.; (3) whether petitioners underreported their taxable income for 1979 and 1980 by failing to include the business income of their wholly owned corporation, Just Me Sales, Inc., in the amounts of $ 65,315 and $ 48,043, respectively, or whether such amounts should be included in petitioners' income as constructive dividends; (4) whether petitioners *232 are entitled to carry back to 1979 and 1980 a net operating loss that allegedly arose in 1982 when their stock in Empire Health and Racquet Club, Inc., so-called section 1244 stock, became worthless; and (5) whether petitioners are liable for additions to tax for fraud pursuant to section 6653(b). FINDINGS OF FACT The parties have stipulated many of the facts in this case. The Stipulation of Facts, the Supplemental Stipulation of Facts filed by the parties, and the exhibits attached thereto are hereby incorporated in this opinion by reference. Petitioners resided in New York City, New York, at the time they filed their petition in this case. During 1978, petitioners maintained joint savings and checking accounts at the following banks: National Bank of Westchester (the Westchester account), Jupiter Tequesta Savings Bank (the Jupiter account), Independence Savings Bank (the Independence account), South Brooklyn Savings Bank (the South Brooklyn account), and Home Federal Savings and Loan (the Home Federal account). During 1978, petitioner Marilyn Grossman also maintained a savings account at the Bank of New York (the BONY account). The balance of this account on January 1, 1978, *233 was $ 35,000. There were no deposits to the account during 1978, other than $ 2,225.30 of interest credited to the account on March 2, 1978. On March 2, 1978, Mrs. Grossman withdrew $ 36,000 from the BONY account. Mrs. Grossman maintained a safe deposit box at Independence Savings Bank, which she used to store cash in amounts ranging from $ 75,000 in 1978 to $ 30,000 in 1979 to $ 25,000 in 1980. During the years at issue, Mr. Grossman also maintained a safety deposit box at Bowery Savings Bank, which he used to store cash of approximately $ 100,000. On March 15, 1978, petitioners purchased a house in Jupiter, Florida, which had been built to their specifications over the course of the prior year. The original price of the house was approximately $ 101,000. However, prior to closing, petitioners paid the builder for various improvements that they had ordered to be made to the house. Petitioners obtained a mortgage on the property in the principal amount of $ 78,000. During the years at issue, petitioners and their wholly owned corporation, Just Me Sales, Inc., (JMS), sold women's belts and fashion accessories. Petitioners began this business in 1978 after Mr. Grossman's former *234 business, Roof Health Club, Inc., ceased operations. Initially, petitioners conducted the business as a sole proprietorship. On September 5, 1978, they incorporated JMS under the laws of the State of New York, and the corporation began to conduct the business. Mr. Grossman owned all of JMS's stock during the period at issue in this case. Petitioners incorporated JMS to satisfy the concerns of their landlord in order to obtain a lease. JMS had its own office, checking account, and telephone number, and it advertised under its own name. During 1979 and 1980, petitioners maintained a cash receipts and disbursements journal on behalf of JMS. JMS never filed a corporate income tax return for any of the years at issue, nor did it apply for or obtain an employer identification number during that period. Sometime in December 1978, petitioners received $ 17,275.77 from the settlement of a lawsuit that was related to their ownership of the Jupiter Ocean, Racquet and Swim Club, Inc. Petitioners had incorporated that company to operate a tennis club on the grounds of a condominium complex in Jupiter, Florida (the Jupiter Condominium Complex). In that connection, Jupiter Ocean, Racquet *235 and Swim Club, Inc., had entered into a sublease of certain property in or around the Jupiter Condominium Complex. The lawsuit involved that sublease and certain business relationships of the parties to the sublease. The parties to the lawsuit executed a mutual release in settlement of their dispute. The release was executed by the following persons, related to petitioners: Jupiter Racquet and Swim Club, Inc. Flomar Realty, Inc. Marilyn Realty, Inc.
Jerry Grossman, Individually Marilyn Grossman, Individually The record of this case does not fully describe the lawsuit or the interest of the above persons in it. On page 1 of their joint 1978 U.S. Individual Income Tax Return, Form 1040, petitioners reported total income of $ 13,272, consisting of the following: Wages, salaries, tips, etc.
$ 10,841 Interest income
2,480 State and local tax refunds
706 Capital gain/loss
(3,000)
Pensions, annuities, rents, etc.
2,245 Total  13,272 The above wages, salaries, and tips of $ 10,841 consist of $ 5,250 of wages paid to Mr. Grossman by the Roof Health Club, Inc., and $ 5,591 of wages paid to Mrs. Grossman for her services as a schoolteacher. Mrs. Grossman had *236 taught at a public high school for approximately 11 years, ending in February 1978. Petitioners' 1978 return reports nothing about petitioners' involvement with JMS or Jupiter Ocean, Racquet and Swim Club, Inc., nor does it report the $ 17,257.77 of proceeds from the settlement that petitioners received from the litigation involving the latter corporation. During 1979, JMS maintained a checking account at Manufacturers Hanover Trust Co. (the JMS MHTCO account). Deposits to the JMS MHTCO account during 1979 totaled $ 545,585. Of that amount, $ 532,585 consists of gross receipts from JMS's business activities, and $ 13,000 consists of loans made by petitioners to JMS. During 1979, petitioners caused JMS to pay its business expenses from the JMS MHTCO account. They also caused JMS to pay certain of petitioners' personal expenses from the JMS MHTCO account, as further discussed below. These personal expenses included payments for petitioners' rent, home mortgage, utilities, phone, food, medical expenses, and child support owed by Mr. Grossman to his children from a prior marriage. In August of 1979, petitioners received a distribution of $ 14,350.19 from Flomar Realty, Inc. (Flomar). *237 Petitioners had formed Flomar approximately 2 years earlier, on July 15, 1977, under the laws of the State of Florida, to purchase and sell Florida real estate. Shortly after its formation, Flomar purchased a condominium at the Jupiter Condominium Complex for $ 36,000 by making a downpayment of $ 9,000 and assuming a $ 27,000 mortgage. Flomar made the subject 1979 distribution of $ 14,350.19 to petitioners approximately 1 month after it sold the condominium for $ 45,000. Flomar maintained no books or records during any of the years in issue. It never applied for or received an employer identification number, and it never filed a Federal income tax return. Similarly, Flomar did not have a bank account, and petitioners paid all of the expenses of maintaining the condominium at the Jupiter Condominium Complex. On page 1 of their joint 1979 U.S. Individual Income Tax Return, Form 1040, petitioners reported total income of $ 17,356, consisting of the following: Wages, salaries, tips, etc.
$ 5,200 Interest income
1,539 Business income
11,056 Capital loss
(3,000)
Pensions, annuities, rents, etc.
2,561 Total  17,356 Attached to their 1979 return is a Schedule *238 C, Profit or (Loss) From Business or Profession, for a sales business operated by Mr. Grossman under the name "Jerry Grossman". That Schedule C reports net profit of $ 11,056, as follows: Income:
Gross receipts or sales commissions  $ 48,125
Deductions:
Commissions  $ 31,869
Wages  5,200
Total deductions   37,069
Net profit    11,056
The above gross receipts are attributable to commissions received by Mr. Grossman from Karen Handbags (also known as JAK), an unrelated concern, for his efforts in selling Karen Handbags' merchandise. The record does not disclose to whom Mr. Grossman paid the $ 31,869 in commissions deducted on the above Schedule C. Petitioners did not report on their 1979 return the personal expenses that JMS had paid during the year on their behalf, nor did they report the $ 14,350.19 that Flomar had distributed to them. On page 1 of their joint 1980 U.S. Individual Income Tax Return, Form 1040, petitioners reported total income of $ 17,375, consisting of the following: Interest income
$ 2,539 Business income
14,135 Capital loss
(3,000)
Rent and royalties
2,586 Gambling winnings
1,115 Total  17,375 Attached to their *239 1980 return is a Schedule C, Profit or (Loss) From Business or Profession, for a business identified as "Just Me Sales, Co." The main business activity of the business is listed on Schedule C as "Jobber" and the product is listed as "Handbags". The Schedule C reports net profit from the business of $ 14,135, computed as follows: Income:
Gross receipts or sales  $ 465,496
Cost of goods sold and/or operations  407,482
Gross profit  58,014
Other income  --  Total income   58,014
Deductions:
Advertising  1,783
Commissions  22,759
Dues and publications  116
Freight  794
Laundry and cleaning  100
Office supplies  695
Postage  1,863
Rent on business property  9,551
Telephone  4,242
Utilities  962
Messenger  47
Miscellaneous  967
Total deductions   43,879
Net profit    14,135
During 1982, petitioners maintained several personal bank accounts. In addition to the Independence account, mentioned above, petitioners maintained accounts at Lighthouse Savings Bank (the Lighthouse account), Manufacturers Hanover and Trust Co. (the Personal MHTCO account), and Citibank (the Personal Citibank account). The deposits into these accounts *240 during 1982 are as follows: Lighthouse account
$ 4,600.00
Personal Citibank account
1,269.44
Personal MHTCO account
21,560.69
Independence account
15,079.00
Total  42,509.13
The amount deposited into the Independence account, $ 15,079, consists entirely of nontaxable transfers from petitioners' other accounts. JMS maintained two bank accounts during 1982. In addition to the JMS MHTCO account, mentioned above, JMS maintained an account at Citibank (the JMS Citibank account). The deposits into these accounts during 1982 are as follows: JMS MHTCO account
$ 77,508.97
JMS Citibank account
92,139.79
Total  169,648.76
On January 22, 1980, Mr. Grossman incorporated Empire Health and Racquet Club, Inc. (Empire), to operate a health club in the Empire State Building. This business venture was unsuccessful, and on February 22, 1982, Empire filed a voluntary petition under chapter 11 of the Bankruptcy Code in the Southern District of New York. On May 10, 1982, Empire's bankruptcy case was converted to a chapter 7 case. Attached to petitioners' joint 1982 U.S. Individual Income Tax Return, Form 1040, is a Form 4797, Supplemental Schedule of Gains and Losses. *241 In part II of Form 4797, "Ordinary Gains and Losses", petitioners reported a loss of $ 298,000 from "Empire State Health and Jogging Club, Inc. -- sec. 1244 stock". The form states that the stock had been acquired on "10/31/81" and was sold on "4/29/82". The form also states that the gross sales price minus expense of sale was zero and that petitioners' cost or other basis, plus improvements, was $ 298,000. OPINION Respondent audited petitioners' income tax returns for 1978 through 1980 and found that petitioners' records were incomplete. Accordingly, respondent chose to calculate petitioners' income for 1978 and 1979 using the bank deposits method. Sec. 446(b); see Petzoldt v. Commissioner, 92 T.C. 661 (1989). Based upon the information discovered during the audit, respondent determined that petitioners had underreported their taxable income as follows: 1978
1979
1980
a.
Unreported income
$ 46,094 --   --   b.
Dividend income,
--   $ 14,150 --   Flomar c.
Interest income
--   353 --   d.
Schedule C business
--   65,315 $ 48,043 income, Just Me Sales e.
Schedule A,
--   --  575 gambling losses f.
Itemized deduction
--   (364)
--   adjustment g.
Personal exemptions
(2,250)
(3,000)
(3,000)
Total adjustments  43,844 76,454 45,618 *242 Petitioners take issue with adjustments a., b., and d., set forth above, and concede the others. They bear the burden of proving that respondent's determination is incorrect as to each of those adjustments. Rule 142, Tax Court Rules of Practice and Procedure; Estate of Mason v. Commissioner, 64 T.C. 651, 656-657 (1975), affd. 566 F.2d 2 (6th Cir. 1977). Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure. As a threshold matter, we note petitioners' contention that respondent's determination for 1978 is invalid because: "Respondent has never placed the taxpayers in an income producing source in 1978 which would yield the alleged unreported income of $ 31,094." Petitioners cite Janis v. Commissioner, 428 U.S. 433 (1976), Weimerskirch v. Commissioner, 596 F.2d 358 (9th Cir. 1979), revg. 67 T.C. 672 (1977), and Gerardo v. Commissioner, 552 F.2d 549 (3d Cir. 1977), affg. in part and revg. in part T.C. Memo. 1975-341, for the proposition *243 that respondent must show a taxable source for the unreported income determined in the notice of deficiency. Petitioners suggest that the subject notice of deficiency is a "'naked assessment' without any foundation whatsoever," Janis v. Commissioner, supra at 441, with the result that the usual rule imposing the burden of proof on the taxpayer, does not apply, see, e.g., Gerardo v. Commissioner, supra at 553. We disagree. Respondent found that petitioners' business records were not adequate to compute their taxable income for 1978, a finding that petitioners do not challenge, and respondent resorted to the bank deposits method to make that computation. In computing petitioners' taxable income for 1978, respondent took into account the deposits made to their bank accounts during the year. Under these circumstances, there is no requirement that respondent produce other evidence linking petitioners to an income-producing activity as a precondition to requiring petitioners to meet their burden of proof. Tokarski v. Commissioner, 87 T.C. 74, 76-77 (1986); see also DiLeo v. Commissioner, 96 T.C. 858, 867-868 (1991), *244 affd. 959 F.2d 16 (2d Cir. 1992); Estate of Mason v. Commissioner, supra at 657. 1978 -- Unreported Income
In the subject notice of deficiency, respondent determined that petitioners' taxable income for 1978 should be increased by $ 46,094, the amount of unexplained deposits to their personal checking and savings accounts. The notice of deficiency describes this adjustment as follows: In the absence of adequate records, your taxable income for the taxable year 1978 is figured by reference to bank deposits and cash payments, plus personal and other nondeductible expenditures. Accordingly, your reported taxable income has increased $ 46,094.00, figured as shown in Exhibit A.
Prior to trial, respondent conceded that an additional $ 15,000 of deposits constituted transfers between accounts. Thus, in effect, respondent determined that there were unexplained deposits to petitioners' accounts during 1978 of $ 31,094. Based upon the record presented at trial, respondent now contends that the unexplained deposits to petitioners' personal checking and savings accounts amount to $ 41,241.76. Set out below is *245 a schedule of the unreported income determined by respondent in the notice of deficiency, $ 31,093.76 (as reduced by additional transfers of $ 15,000), and the unreported income that respondent contends was proven at trial, $ 41,241.76: Deposits
Notice
At Trial
Difference
Westchester account
$ 35,331.16 $ 35,331.16 --   Jupiter account
20,329.61 40,329.61 $ 20,000 Independence account
22,692.99 26,112.99 3,420 South Brooklyn account
13,003.00 13,003.00 --   Home Federal account
15,000.00 15,000.00 --   Total deposits 106,356.76 129,776.76 23,420 Less: explained deposits
Transfers  (71,018.00)
(75,263.00)
(4,245)
Gifts  (2,000.00)
--    2,000 Rents  (2,245.00)
--    2,245 Unexplained deposits 31,093.76 54,513.76 23,420 Less: amt. reported
--    (13,272.00)
(13,272)
on return Unreported income 31,093.76 41,241.76 10,148 Petitioners take issue with various deposits to the Jupiter and Independence accounts included in each of respondent's computations of unreported income, as shown above. They do not contest the deposits to the other accounts. Set out below is a schedule of the deposits to the *246 Jupiter and Independence accounts, as determined in the notice of deficiency, and as asserted by respondent's post-trial brief: Deposits to Jupiter Account:
Notice
At Trial
Difference
03/09/78  --   $ 20,000.00
$ 20,000.00 04/17/78  $ 8,493.61
8,493.61
--    04/20/78  10,950.00
10,950.00
--    12/26/78  886.00
886.00
--    Total
20,329.61
40,329.61
20,000.00 Deposits to
Independence Account: Notice
At Trial
Difference
06/19/78  --   $ 3,789.70 $ 3,789.70  07/05/78  --   200.00
200.00 08/01/78  --   200.00
200.00 08/01/78  --   3,184.74
3,184.74 08/09/78  --   200.00
200.00 08/09/78  --   200.00
200.00 08/16/78  --   200.00
200.00 08/29/78  --   200.00
200.00 09/02/78  $ 5,753.00
1,000.00
(4,753.00)
09/20/78  200.00
200.00
--    10/19/78  1,900.00
1,900.00
--    11/15/78--12/12/78  14,839.99
14,839.99
--    Total
22,692.99
26,114.43
3,421.44 We note that information regarding the deposits to the Independence account, as shown above in the aggregate amount of $ 26,114.43, was taken from petitioners' check register, a copy of which was introduced into evidence. That *247 amount is $ 1.44 more than the amount used by respondent, $ 26,112.99. We also note that respondent filed a second amendment to the Commissioner's answer to specifically allege that the deposits to the Jupiter account should be increased to $ 40,329.61 from $ 20,329.61, the amount determined in the notice of deficiency, and to further allege that the deposits to the Independence account between June 19, 1978, and September 2, 1978, should be increased to "$ 9,173.00" from $ 5,753, the amount determined in the notice of deficiency. We must decide five issues concerning the above deposits to the Jupiter and Independence accounts. Three of the issues involve deposits that were included in the notice of deficiency, and two of the issues involve the additional deposits that respondent claims to have been proven at trial. As to the deposits that were included in the notice of deficiency, petitioners bear the burden of proving that they are not includable in petitioners' taxable income. Rule 142(a). As to the deposits that were not included in the notice of deficiency, viz, $ 20,000 into the Jupiter account, and $ 3,421.44 into the Independence account, respondent's reply brief concedes *248 that respondent bears the burden of proving that these two additional amounts should be included in petitioners' taxable income. The first issue raised by petitioners concerning respondent's determination for 1978 involves the deposit of $ 8,493.61 into the Jupiter account on April 17, 1978. Petitioners claim that this amount is a transfer from Mrs. Grossman's BONY account. At trial, Mrs. Grossman testified that she withdrew $ 36,000 from the BONY account on March 2, 1978, shortly before she went to Florida to complete the purchase of a house in Jupiter, Florida, on March 15, 1978. She testified as follows: I did not know what my closing fees were going to be on the house and so I had extra cash on me. We closed on the house on March 15th. I did not need that kind of money. I had to end up coming back to New York because of the doctor's recommendation -- he thought I was going to deliver my baby sooner than June and he didn't want me flying that late so I had to immediately fly back to New York. I brought the cash back with me and at times I would put the cash into my safety deposit box because Jerry was going to be starting up a business and we needed cash to operate the *249 business.
The above testimony, that Mrs. Grossman returned to New York with the cash withdrawn from the BONY account "immediately" after the closing on March 15, 1978, does not support the factual contention, set forth in petitioners' post-trial brief, that the same cash was the source of the subject deposit made into the Jupiter account in Florida on April 17, 1978. There are other problems with petitioners' claim that the source of the subject deposit is the cash withdrawn from Mrs. Grossman's BONY account. For example, Mrs. Grossman testified that she withdrew the $ 36,000 from the BONY account in $ 50 and $ 100 bills. Mrs. Grossman's testimony does not explain how or why it came about that she made a cash deposit of an odd amount, $ 8,493.61, into the Jupiter account. We sustain respondent on this issue. The second issue raised by petitioners concerning respondent's determination for 1978 involves the deposit or deposits of $ 14,839.99 made into the Independence account between November 15, 1978, and December 12, 1978. In reviewing petitioners' check register for the Independence account for 1979, respondent's agent noted that the balance in the account on November *250 6, 1978, was $ 3,125, that the balance in the account on December 12, 1978, was $ 15,899.68, and that checks totaling $ 2,065.31 had been written between November 6, 1978, and December 12, 1978. Respondent determined that $ 14,839.99 must have been deposited into the account between those dates, computed as follows: Ending balance
$ 15,899.68 Beginning balance
($ 3,125.00)
Checks written
2,065.31 (1,059.69)
Deposit  14,839.99 Petitioners do not deny that they deposited $ 14,839.99 into the Independence account between November 6 and December 12, 1978. Rather, they claim that this amount came from the settlement of $ 17,275.77 received in the lawsuit involving petitioners' attempt to operate a tennis club at the Jupiter Condominium Complex, discussed above. Petitioners' post-trial brief states as follows: It is the contention of the petitioners that they have demonstrated the * * * [existence] of an available fund at or about the date of the entries in * * * [petitioners' check register] which can explain this item. * * * Petitioners rebut this assumption of a taxable deposit with the explanation of the receipt of a check in the amount of $ 17,000 *251 on December 1, 1978. * * * The testimony reveals * * * that the taxpayers had been involved in a lawsuit in Florida which resulted in the recovery of this amount of money * * * and that a check in that amount was received on or about December 1, 1978. This amount or any portion thereof was available for a deposit or deposits.
We have a number of difficulties with petitioners' position on this issue. First, petitioners offer no proof, such as bank records or other documentary evidence, that the settlement proceeds were actually the source of the subject deposit or deposits in the amount of $ 14,839.99. Second, Mrs. Grossman's testimony on the point is vague and does not prove petitioners' assertion. She testified as follows: Q Mrs. Grossman, the parties have stipulated to the fact that between 11/15/78 and 12/12/78 Exhibit 13-N, which is the Independence Savings Bank check register, that there were no deposits made during that period. As a result the agent made a computation of checks which were issued on that with no deposit being shown and concluded that an amount of 14,839.99 must have been deposited during that period. I call to your attention that this amount for *252 Florida was received on or about December 1st. Are you able to tell me what you did with the proceeds of that check, the $ 17,000 check? A I would have put it into my account in New York. That came up from Florida. The check was sent up from West Palm Beach, Florida, and I may have put part of it was cash and kept some of it as cash. Q Can you tell me why this particular check register which is 13-M doesn't record any deposits during this period of time? A I may have cashed the check completely and just took the whole thing as cash and put some of it in the safety deposit box. Q Why would no deposits have been recorded in this particular bank during this period of time? A Why would no deposits have been made? Q That's right, while checks were being written. A I don't understand the question. Q Well, if checks were being written on this bank account between the period as contended by respondent from 11/15 -- A That was not the only bank account I had at the time. Q No, but there were no deposits made into this particular bank and the agent said that you must have made deposits because you wrote checks. Do you know whether you just neglected to enter your deposits here *253 or is there any explanation? A That's possible. To be honest I don't recall right at this moment. I know that I did get the proceeds and I generally probably would have put it into an account. If I didn't, then I cashed it and might have put it in as I needed it, or I might have put it into my safety deposit box. * * * Q You testified earlier about approximately $ 17,000 proceeds that you received from the litigation in Florida. Do you recall that testimony? A Yes. Q Did you put that money in the safety deposit box? A As I testified, I probably cashed the check and put most of that into the safety deposit box. I might have put part of it into one of my accounts. You pointed out that you didn't see the deposit at that particular moment.
The third difficulty we have with petitioners' position on this point is that, even if we were able to find that the source of the $ 14,839.99 deposit or deposits was the proceeds of the settlement of the Jupiter Condominium Complex litigation, petitioners have not proven that the settlement proceeds are excludable from taxable income. Mrs. Grossman's testimony concerning the nature of the lawsuit is the following: Q And could *254 you tell us briefly what that was all about, that lawsuit? A The lawsuit involved the Jupiter Racquet and Swim Club. In 1977 when we were first in Jupiter, we got involved in a business and it was to operate 13 tennis courts and a swimming pool in a complex that had some condominiums. What happened was this parcel was part of a project and we were going to lease that business. During that amount of time the person that -- the people that we leased it from got involved where the banks were going to foreclose on the project, which now also involved this tennis complex. What was happening is the people that leased to us wanted us off -- they wanted to break the lease and wanted us off the premises, so they slowly but surely turned off the water for the clay courts and it made the courts inoperable and we could not operate the business. We ended up in court and what happened was we won the case because the grounds superintendent and various people spoke up in our behalf and said that we were being sabotaged. The moneys that we got back were the moneys that we had put into the operations of the business that didn't operate primarily. The proceeds we got in litigation were the *255 moneys that we had expanded [sic] during that year and the attorney's fees and so forth. On the advice of counsel and so forth we fought them and we won and based on that situation he said that we should get out of that situation, which is what we did.
Petitioners introduced into evidence an "Authorization to Disburse Funds" and "Mutual Release" dated December 1, 1978, between: JUPITER RACQUET AND SWIM CLUB, INC., A/K/A/ JUPITER OCEAN, RACQUET AND SWIM CLUB, INC.; FLO-MAR REALTY, INC.; MARILYN REALTY, INC.; JERRY GROSSMAN AND MARILYN GROSSMAN, individually * * * and JUPITER OCEAN AND RACQUET CLUB, INC, , OCEAN RESORTS INC. and MARC EQUITY OF FLORIDA, INC AND COFFEY-LEE, INCORPORATED * * * The Authorization to Disburse Funds portion of the above document recites that petitioners are to receive $ 17,275.77, in exchange for the release and settlement of certain claims. The document is signed by petitioners individually, as well as on behalf of "Flo-Mar Realty Inc.", "Marilyn Realty, Inc.", and "Jupiter Ocean, Racquet and Swim Club, Inc." We fail to see how that document establishes the nontaxability of those funds in petitioners' hands. Thus, we sustain respondent *256 on this issue. The third and fourth issues raised by petitioners concerning respondent's determination for 1978 involve deposits to the Independence account during the period June 19, 1978, through September 2, 1978. As mentioned above, in computing the adjustment set forth in the notice of deficiency, respondent included a deposit of $ 5,753 into the Independence account on September 2, 1978. Respondent now claims that nine deposits totaling $ 9,174.44 were made into the account during the period June 19, 1978, through September 2, 1978, and respondent seeks to increase the adjustment by $ 3,421.44, the difference between $ 5,753 and $ 9,174.44. As noted earlier, petitioners bear the burden of proving that respondent erroneously included the $ 5,753 amount as a deposit, but respondent concedes petitioners' contention that the Government bears the burden of proving that the additional amount of $ 3,421.44 should be included in petitioners' income. Petitioners' checkbook register for the Independence account covering the period June 19, 1978, through September 2, 1978, lists the following deposits: Date
Notation
Amount
6/19
Deposit
$ 3,789.70
7/05
personal check
200.00
8/01
[illegible]
200.00
8/01
[illegible] stock
3,184.74
8/09
Karen Bags
200.00
8/09
commission
200.00
8/16
Karen Bags
200.00
8/29
commission
200.00
9/02
commission/
1,000.00
Karen Bag Total  9,174.44
*257 Petitioners' checkbook register suggests that they deposited a total of $ 9,174.44 into the Independence account between June 19 and September 2, 1978. Petitioners' own document, therefore, supports respondent's determination. Petitioners introduced no evidence to prove that any part of the $ 5,753 in deposits, as to which they have the burden of proof, came from nontaxable sources. Accordingly, we sustain respondent as to those $ 5,753 of deposits. Petitioners' checkbook register for the Independence account also suggests that petitioners did in fact deposit the additional $ 3,421.44 as claimed by respondent. However, respondent has not established that the additional deposit or deposits that comprise this amount derive from taxable sources and thus are includable in petitioners' income. Respondent cannot rely solely on petitioners' checkbook register to prove that each of the deposits is subject to tax. Much of the register is illegible. Furthermore, as conceded by respondent, Mrs. Grossman maintained a safe deposit box in which she kept cash, the balance of which decreased from $ 75,000 in 1978 to $ 30,000 in 1979. In light of these facts, we find that respondent has *258 failed to prove that the balance of the deposits, $ 3,421.44, is taxable to petitioners. The last issue raised by petitioners concerning respondent's determination for 1978 involves a putative deposit of $ 20,000 to the Jupiter account on March 9, 1978. Respondent did not include this deposit among the adjustments set forth in the notice of deficiency, and respondent concedes that the Government bears the burden of proving that it should now be included. Respondent claims that petitioners' check register makes it clear that a deposit of $ 20,000 was made on March 9, 1978, and should be included in the computation of petitioners' taxable income. We disagree. Petitioners' checkbook register for the Jupiter account on which respondent relies is itself unclear as to when petitioners made the deposit. The subject deposit is entered on a page of the checkbook register that is divided by a horizontal line over which is written the notation "1978." The $ 20,000 deposit appears above the horizontal line, implying that petitioners made the deposit in 1977. However, next to the deposit there is a notation that is either "3/4" or "3/9", implying that petitioners made the deposit on March *259 4 or March 9, 1978. Thus, the notations in the checkbook register are inconsistent as to the date of the deposit. This inconsistency is underscored by the actions of respondent's agent. The agent did not include the deposit in petitioners' income during the audit because it appears above the line purportedly dividing 1978 and 1977. The agent testified as follows: Well, the $ 20,000 that I left out in analyzing this deposit -- when you take a look at the check register in both it says 1978 so I took it that this is deposits or activity in the account in the year 1978 and since that appeared further up to the left or to the right, I just overlooked it.
Thus, during the audit, the agent took the dividing line at face value and concluded that the deposit should not be included among 1978 deposits. Respondent's post-trial position, that the deposit should be included, is based upon no new evidence but on a reevaluation of petitioners' checkbook register. We do not think respondent has satisfied her burden with regard to the $ 20,000 deposit. The checkbook register is inconsistent and unclear, a fact underscored by the actions of respondent's agent. In finding for petitioner *260 on this issue, we note that respondent did not choose to obtain petitioners' bank records to establish with certainty when the subject deposit was made. 1979 -- Dividend Income From Flomar
Respondent also determined that petitioners received a dividend from their wholly owned corporation, Flomar, in the amount of $ 14,350.19, consisting of the proceeds from Flomar's sale of the condominium that it had purchased in the Jupiter Condominium Complex. The subject notice of deficiency states as follows: It is determined that during 1979 Flomar Realty Inc. made payments to you, or for your benefit, and permitted you to use corporate property without compensation. Such items are dividend income which are taxable under Section 61 of the Internal Revenue Code which is includible in your gross income in the amount of $ 14,150.00 ($ 14,350.00 less $ 200.00 dividend exclusion).
On brief, respondent concedes that the amount of the dividend is limited to $ 9,000, the amount of Flomar's earnings and profits from the transaction, calculated as follows: Selling price of condominium
$ 45,000
Adjusted basis
36,000
Gain (earnings and profits)  9,000
Petitioners bear the *261 burden of proving that they did not receive a taxable dividend, as determined by respondent. Rule 142(a). Petitioners claim that they formed Flomar with another couple, Florence and Robert Kaden, to purchase a condominium in the Jupiter Condominium Complex as an investment. According to petitioners, the name Flomar is a combination of the names Florence Kaden and Marilyn Grossman. Petitioners claim that each couple contributed approximately $ 4,500, one-half of the downpayment of approximately $ 9,000, towards the purchase of the condominium in August of 1977 and that the purchase price of the condominium was approximately $ 36,000. The balance of the purchase price was financed by assuming a mortgage of approximately $ 27,000. Petitioners claim that, except for the portion of the downpayment contributed by the Kadens, they made all of the expenditures relating to the condominium during the time it was owned by Flomar. The following is a schedule of the expenditures that they claim to have made during the time Flomar owned the condominium: Certificate of incorporation
$ 413.00
Assumption fee
100.00
Escrow tax shortage
215.43
Advance to open Flomar checking account
50.00
Closing fees (at purchase)
8,934.00
Broyhill furniture rental
347.25
Caher's Furniture
1,649.28
Additional furnishings
350.00
Mortgage (1st Federal Savings of P.B.)
$ 266 X 7 months   1,862.00
$ 278 (tax mo.) X 12 months   3,336.00
Yearly sewerage fee
78.00
Maintenance fee (condo)
1,417.24
Utilities
366.86
Total  19,119.06
Less: 1/2 of above closing fees
4,467.00
14,652.06
*262 We note that the above expenditures total $ 19,119.06, not $ 19,118.63, the amount used by petitioners. In effect, petitioners claim to have paid $ 14,650.06 (i.e., total expenditures, $ 19,119.06, less one-half of the downpayment, $ 4,467). Flomar sold the condominium on March 16, 1979, for $ 45,000 and, according to the settlement sheet from the sale, Flomar became entitled to receive net cash from the sale of $ 14,350.19. Petitioners claim that they received such amount from the attorney who closed the transaction in the form of a check made payable to "Marilyn Grossman, Jerry Grossman and Florence Kaden". They claim that they gave Robert Kaden a check dated May 1, 1979, for $ 4,350 and retained the rest, $ 10,000.19. Petitioners' position is that the notice of deficiency is in error for two reasons. First, as described above, they claim to have received $ 10,000.19, not $ 14,350.19 as determined by respondent. Based upon the claim that they paid all of the expenditures relating to the condominium during the time it was owned by Flomar, petitioners claim to have lost approximately $ 4,000 (i.e., amount received, $ 10,000, less expenditures paid, $ 14,651.63). Second, petitioners *263 contend that after the sale of the subject condominium, the distribution of the proceeds of the sale was a distribution of all of Flomar's assets. Thereafter, according to petitioners "the corporation merely ceased to exist." Petitioners contend that the distribution constituted a "defacto liquidation" of Flomar. Petitioners describe this issue as "the classic question of dividend income versus return of capital." However, they do not explain the legal basis for their position that the distribution is not subject to tax as a dividend, and they cite no provision of the Internal Revenue Code or case law on which that position is based. In fact, as noted by respondent, Flomar realized earnings and profits of approximately $ 9,000 on the transaction and petitioners received those earnings and profits from Flomar. Moreover, we find Mrs. Grossman's testimony to be vague and unbelievable. She testified that the condominium was purchased as an investment. She said: "we had hoped that we could turn it over quickly and then purchase another one and sell that one and so forth." On the other hand, the petition, signed by both petitioners, alleges that the condominium was a "vacation cottage". *264 The petition states as follows: c. Dividend income of $ 14,350. from Flomar Realty Inc. was charged to petitioners for 1979 on account of payments to them and for them and for their use of corporate property. Actually, this venture represented nothing more than a vacation cottage in Florida, which the petitioners had purchased with another couple for the purpose of personal enjoyment. No depreciation or other deduction was claimed thereon because it was a non-profit entity much like a Coop. apartment. The only reason for the corporate form was the protection against lawsuits in the event that anyone was injured on the property or if some other unexpected major expenditure became necessary.
Furthermore, Mrs. Grossman testified: "for the most part the villa was vacant. A good part of the time it was vacant." However, the record contains petitioners' checks for telephone service and cable TV service to the condominium in 1979 shortly before it was sold. Mrs. Grossman also testified that she and her husband were equal owners of Flomar and that each couple had contributed one-half of the downpayment on the condominium. However, petitioners introduced no direct evidence *265 of the Kadens' investment in Flomar, such as stock records, testimony from one of the Kadens, or the like. Furthermore, it appears that petitioners and the Kadens did not act like equal owners. As mentioned above, Mrs. Grossman testified that she and her husband paid all of the expenses for the condominium while it was owned by Flomar, approximately $ 14,652.06, and the Kadens paid nothing. She testified as follows: Q * * * Why were you paying when it was actually apparently joint venture? Weren't you supposed to share the expenses of what transpired? A What transpired was the one that was traveling back and forth to Florida primarily and what we decided was, when we saw the handwriting on the wall, right from the beginning, the real estate market going so sour, and then having the added problems of the Jupiter Racquet and Swim Club right on the premises it was -- I said to Florence I will pay the bills in it and I will give you an accounting and when we sell the unit we will split the difference.
Additionally, when the condominium was sold, petitioners claim to have given the Kadens $ 4,350, the amount of their original investment, even though petitioners' claim *266 to have lost approximately $ 4,000 on the transaction. For these reasons, we are not satisfied with petitioners' explanation of the transaction, and we find that petitioners have not met their burden of disproving respondent's determination. Accordingly, we sustain respondent's determination that petitioners failed to report a dividend from Flomar in 1979, and we find that the amount of the dividend is $ 9,000. 1979 and 1980 -- Schedule C, Business Income, JMS
In the notice of deficiency, respondent determined that petitioners received additional business income from JMS in the amount of $ 65,315 in 1979 and $ 48,043 in 1980. The notice of deficiency states as follows: It is determined that during the taxable years 1979 and 1980 you received additional business income from Just Me Sales Inc. in the amounts of $ 65,315.00 and $ 48,043.00, respectively. Accordingly, your taxable income is increased $ 65,315.00 and $ 48,043.00, respectively for the years 1979 and 1980.
At the outset, it is helpful to note that respondent's method of computing the adjustment for 1979 differs from respondent's method of computing the adjustment for 1980. In the case of 1979, respondent *267 made an analysis of the deposits to the JMS MHTCO account and computed the business income realized by JMS based upon a deposits analysis. The following schedule sets forth respondent's computation of the 1979 adjustment and petitioners' position with respect to that adjustment: Petitioners'
1979
Notice
Position
Deposits
$ 545,585 $ 545,585.00 Loans from petitioners
(13,000)
(49,156.44)
Taxable sales  532,585 496,428.56 Total expenses  ($ 503,725)
Nondeductible expenses
47,511 Total deductible expenses  (456,214)
(456,214.00)
Business income  76,371 40,214.56 Amount reported
(11,056)
(11,056.00)
Unreported  65,315 29,158.56 business income   Petitioners reported no income attributable to JMS's operations in 1979. Petitioners' principal position is that the above business income was earned by JMS and respondent errs by including JMS's net profit in computing petitioners' 1979 tax. Petitioners also contend that the nondeductible expenditures in the amount of $ 47,511 are repayments by JMS of loans or advances made by petitioners in the aggregate amount of $ 49,156.44. For their 1980 taxable year, petitioners *268 reported the income and deductions of JMS on a Schedule C, Profit or (Loss) From Business or Profession, filed with their joint return. In adjusting petitioners' taxable income, respondent compared the income and deductions thus reported with a statement of income and retained earnings for JMS for 1980 that was provided to respondent's agent by a representative of the company. Based upon that comparison, respondent made five adjustments that have the effect of increasing net profit from $ 14,135, the amount reported, to $ 62,177.96, an increase of $ 48,042.96. Petitioners do not take issue with respondent's recomputation of JMS's net profit for 1980. Their position is that respondent errs by including JMS's net profit in computing their 1980 tax. The following schedule sets forth the net profits reported on petitioners' 1980 return and the recomputation thereof in the subject notice of deficiency: 1980
Return
Notice
Difference
Gross receipts
$ 465,496 $ 470,350.57 $ 4,854.57 Purchases
99,103 150,199.18 51,096.18 Cost of labor
293,588 205,480.48 (88,107.52)
Materials and supplies
14,791 -- (14,791.00)
Cost of goods sold  (407,482)
(355,679.66)
(51,802.34)
Gross profit
58,014 114,670.91 56,656.91 Total deductions  43,879 52,492.95 8,613.95 Net profit   14,135 62,177.96 48,042.96 *269 The main issue raised by petitioners for 1979 and 1980 is whether the net profits realized from the women's belts and fashion accessories business is includable in petitioners' income. This issue turns upon whether JMS should be respected as a separate entity for Federal tax purposes. Respondent argues that JMS is a sham and should not be respected for tax purposes. Respondent emphasizes that: (1) Petitioners reported JMS's income and deductions on Schedules C filed with their personal tax returns; (2) they failed to file corporate tax returns on behalf of JMS; and (3) they failed to obtain an employer identification number for JMS. Based on those facts, respondent argues that "since the petitioners themselves have not respected the corporate forms, the respondent * * * should not be required to do so." Respondent also alleges that petitioners commingled personal and corporate funds, they formed JMS as a vehicle to deduct personal expenditures, and they operated the corporation as their alter ego. We note that respondent does not question Flomar's separate corporate identity. The general rule is that the separate existence of a corporation must be respected for tax purposes *270 if a bona fide purpose of the corporation was to perform some real substantial business function or if it actually engages in business. See Moline Properties, Inc. v. Commissioner, 319 U.S. 436, 438-439 (1943); Jackson v. Commissioner, 24 T.C. 1 (1955), affd. 233 F.2d 289 (2d Cir. 1956). "The degree of corporate purpose and activity requiring recognition of the corporation as a separate entity is extremely low." Strong v. Commissioner, 66 T.C. 12, 24 (1976), affd. per curiam 553 F.2d 94 (2d Cir. 1977); see also Ogiony v. Commissioner, 617 F.2d 14, 16 (2d Cir. 1980), affg. T.C. Memo. 1979-32. We stated in Keller v. Commissioner, 77 T.C. 1014, 1031 (1981), affd. 723 F.2d 58 (10th Cir. 1983), that "The policy favoring the recognition of corporations as entities independent of their shareholders requires that we not ignore the corporate form so long as the corporation actually conducts business." In this case, the record shows *271 that during both 1979 and 1980, JMS actually conducted the women's belts and accessories business. It maintained an office and telephone. It advertised. It dealt with customers and suppliers. It received payments, most of which were checks made payable to JMS. It maintained a bank account, and it issued checks. During 1979, the corporation maintained a cash receipts and disbursements journal. The personal expenses paid by the corporation during 1979 are set forth in that journal under accounts labeled "Personal-Fla.", "Personal-N.Y.", and "General Ledger". During 1980, the corporation maintained a cash receipts and disbursements journal and other records. Because JMS actively conducted business during 1979 and 1980, it was not a sham or unreal and should be respected for tax purposes. See Moline Properties Inc. v. Commissioner, supra; see also National Investors Corp. v. Hoey, 144 F.2d 466, 468 (2d Cir. 1944); Skarda v. Commissioner, 27 T.C. 137 (1956), affd. 250 F.2d 429 (10th Cir. 1957). The fact that a corporation does not file a tax return does *272 not, by itself, compel a finding that its corporate form should be disregarded. See, e.g., Kessler v. Commissioner, T.C. Memo. 1977-117; Kubik v. Commissioner, T.C. Memo. 1974-62; Burr v. Commissioner, T.C. Memo. 1966-112. For these reasons, we do not agree with respondent that JMS's corporate existence can be disregarded for Federal income tax purposes. Thus, we do not sustain respondent's determination that petitioners' taxable income for 1979 and 1980 should be increased by $ 65,315 and $ 48,042.96, respectively, as determined in the notice of deficiency. Prior to trial, in an Amendment to Answer, respondent sought to bolster the Government's position by advancing the following alternative allegation: (a) The petitioners received unreported dividend income from Just Me Sales, Co., Inc., during taxable years 1979 and 1980 in the amounts of $ 65,315.00 and $ 48,043.00, respectively.
It is evident that respondent's alternative allegation presupposes the separate corporate existence of JMS and the distribution of JMS's income, directly or constructively, to petitioners as dividends. *273 Respondent's brief states as follows: the respondent has alternatively pled that the petitioners received constructive dividend income from Just Me Sales in the amounts of $ 65,315.00 and $ 48,043.00 for the taxable years 1979 and 1980, respectively, pursuant to sections 61, 301, and 316. Furthermore, there are sufficient earnings and profits to sustain the taxability of the entire amounts as is shown in the respondent's amendment to her answer.
Respondent's alternative allegation raises matters that are not encompassed by the determination set forth in the notice of deficiency. Accordingly, respondent bears the burden of proving her alternative allegation. Rule 142(a); see Achiro v. Commissioner, 77 T.C. 881, 885 (1981); Estate of Falese v. Commissioner, 58 T.C. 895, 898-899 (1972). Respondent must prove not only that petitioners constructively received $ 65,315 and $ 48,043 in dividends from JMS in 1979 and 1980, respectively, but also that JMS had sufficient earnings and profits to permit such amounts to be taxed to petitioners as ordinary dividends. Truesdell v. Commissioner, 89 T.C. 1280, 1295-1296 (1987). *274 In regard to 1979, petitioners concede that JMS paid personal expenses on their behalf in the aggregate amount of $ 47,511. To that extent, respondent has met her burden of proving that distributions were constructively made by JMS to petitioners or for their benefit. We address below petitioners' contention that these payments are not includable in their income because they were repayments of certain loans or advances that petitioners made to the corporation. As to the remaining dividend amount for 1979 alleged in respondent's Amendment to Answer, $ 17,804 (i.e., $ 65,315 less $ 47,511), there is no evidence in the record that the corporation distributed that amount to petitioners either directly or constructively. The fact that petitioners had the authority to influence JMS and the authority to withdraw the funds is insufficient to support a finding that the subject amount is properly includable in petitioners' income. See Jerome Castree Interiors, Inc. v. Commissioner, 64 T.C. 564, 570 (1975), affd. without published opinion 539 F.2d 714 (7th Cir. 1976); Carnahan v. Commissioner, T.C. Memo. 1994-163. *275 Accordingly, we find that respondent has failed to meet her burden of proving that such amount should be included in petitioners' income. Similarly, in the case of 1980, respondent has advanced no evidence to prove that JMS distributed $ 48,042.96 to petitioners, directly or constructively, as alleged in respondent's Amendment to Answer. Jerome Castree Interiors, Inc. v. Commissioner, supra. Accordingly, we find no basis in the record on which to treat this amount as dividend income to petitioners. Turning back to 1979, as mentioned above, petitioners concede that JMS paid personal expenses on their behalf in the amount of $ 47,511. That amount consists of the following expenditures recorded in JMS's cash receipts and disbursements journal: Description Amount
Child support payments to Monmouth County
$ 7,972
Mortgage payments to Mid-Atlantic Corp.
6,500
Legal fees
300
Payments to Marilyn Grossman
9,400
Florida mortgage
9,108
Personal expenditures in Florida
2,639
Apartment rent
5,860
Miscellaneous personal expenditures
5,732
Total 47,511
Petitioners concede that they received $ 47,511 from JMS during 1979, as asserted *276 by respondent. However, as mentioned above, petitioners argue that JMS's payments are not constructive dividends to them because the payments were intended to be repayments of certain loans made by petitioners to JMS. According to petitioners, they had loaned or advanced $ 49,156.44 to JMS during the year, and JMS's expenditures on their behalf represent the repayment of those loans. Petitioners rely on JMS's cash receipts and disbursement journal for 1979 and various deposit slips to establish that $ 49,156.44 of the amounts deposited into the JMS MHTCO account during 1979 was actually loans or advances from petitioners. Petitioners introduced into evidence deposits slips for 20 deposits into the JMS MHTCO account on which there is written the words "loan to business". The date and amount of each of these deposits is as follows: Date
Amount
01/08/79
$ 249.52
$ 249.52
03/14/79
2,200.00
03/16/79
1,000.00
03/15/79
2,142.28
03/20/79
591.17
03/23/79
218.00
03/23/79
75.00
03/26/79
8,000.00
14,226.45
04/03/79
200.00
04/06/79
119.00
04/09/79
2,973.50
04/12/79
1,927.55
04/23/79
6,720.00
11,940.05
05/08/79
1,000.00
05/15/79
2,000.00
3,000.00
06/12/79
361.90
06/13/79
3,000.00
06/18/79
4,497.57
07/03/79
5,000.00
12,859.47
11/26/79
6,941.52
6,941.52
49,217.01
*277 Respondent concedes that the deposit dated March 26, 1979, in the amount of $ 8,000 and the deposit dated July 3, 1979, in the amount of $ 5,000 are loans by petitioners to JMS. Respondent denies that any of the other deposits are loans. We note that the total of the 20 deposits, $ 49,217.01, differs from the total of the loans or advances set forth in petitioners' post-trial briefs, $ 49,156.44. Petitioners do not explain this difference. Furthermore, we note that the 1979 cash receipts and disbursements journal sets forth monthly "loans to business" which total $ 54,345.71. These amounts are as follows: Month Amount
January
$ 249.52
February
430.00
March
14,298.45
April
16,266.75
May
3,000.00
June
12,859.47
November
6,941.52
December
300.00
Total  54,345.71
The record does not explain the discrepancy between the total loans according to the cash receipts and disbursements journal, $ 54,345.71, and the total loans according to deposits slips introduced by petitioners, $ 49,217.01. The factual issue raised by petitioners is whether all or any portion of the personal expenditures made by JMS during 1979 on petitioners' behalf constitutes repayments of *278 loans that petitioners made to JMS. The cash receipts and disbursements journal lists the following six checks to Marilyn Grossman in the aggregate amount of $ 9,100, as "return of loan": Date
Payee Amount
Description Jan. 18
M. Grossman
$ 2,500
Return of loan  Mar. 06
M. Grossman
2,500
Return of loan  Feb. 02
M. Grossman
2,700
Return of loan  Feb. 28
M. Grossman
300
Return of loan to bus.  Nov. -
M. Grossman
1,000
Return of loan to bus.  Nov. -
M. Grossman
100
Return of loan to bus.  Total  9,100
The 1979 cash receipts and disbursements journal was contemporaneously made and describes the purpose of the above payments as "return of loan". We find that JMS made loan repayments to petitioners during 1979 in the amount of $ 9,100. We do not accept Mrs. Grossman's vague testimony that any other payments by JMS during 1979 were intended to be loan repayments. Accordingly, we find that only $ 9,100 of petitioners' expenses paid by JMS during 1979 in the aggregate amount of $ 47,511 was intended as loan repayments. We agree with respondent that the other personal expenses in the amount of $ 38,411 were constructive distributions to petitioners and *279 are includable in petitioners' income as dividends to the extent of earnings and profits. In her Amendment to Answer and on brief, respondent asserts that JMS's earnings and profits for 1979 amount to $ 65,315. Petitioners argue that respondent overstates JMS's earnings and profits for 1979. According to petitioners, JMS's earnings and profits are $ 40,214.56, calculated as follows: Deposits
$ 545,585.00 Loans/nontaxable sources
(49,156.44)
Gross receipts  496,428.56 Expenses
456,214.00 Profit  40,214.56 The above amount is more than the constructive distributions to petitioners of $ 38,411. Therefore, based on petitioners' concession that JMS had earnings and profits for 1979 of $ 40,214.56, we find that the constructive distributions to petitioners in the amount of $ 38,411 are fully includable in petitioners' taxable income as dividends. Carryback of Loss From Empire Stock in 1982
At the start of the first trial of this case, petitioners claimed to have sustained a net operating loss in 1982 that is available as a carryback, pursuant to section 172, to offset their taxable income in 1979 and 1980. According to petitioners, that loss arose in *280 1982 when Empire filed a voluntary petition under chapter 11 of the Bankruptcy Code, and their stock in Empire became worthless as a result. According to petitioners, their stock in Empire qualifies as section 1244 stock, and they are entitled to deduct an ordinary loss in 1982, pursuant to section 1244, in the amount of their investment in Empire. Respondent does not dispute the fact that petitioners' stock in Empire became worthless in 1982 when Empire filed its bankruptcy petition. Respondent's position is that petitioners have not substantiated their investment in Empire. Respondent also argues that petitioners underreported their income for 1982 by an amount which fully absorbs the amount of any section 1244 loss, with the result that there is no net operating loss to carry back. We agree that petitioners have not substantiated their investment in Empire, and we deny petitioners' claim for that reason. We do not reach the issue of whether petitioners failed to fully report their income for 1982. In general, section 1244 provides that, in the case of an individual, a loss on "section 1244 stock" shall be treated, to the limited extent provided therein, as an ordinary loss. *281 In order for the stock to qualify as section 1244 stock, the corporation must qualify as a "small business corporation", the stock must have been issued for money or other property, and more than 50 percent of the corporation's aggregate gross receipts must be derived from sources other than royalties, rents, dividends, interest, annuities, and sales or exchanges of stocks or securities. Sec. 1244(c)(1). For any taxable year, the maximum amount that can be treated as an ordinary loss under section 1244 is $ 50,000 or $ 100,000 in the case of a joint return. Sec. 1244(b). Under section 172, a loss that is treated as an ordinary loss under section 1244 shall be treated as attributable to the trade or business of the taxpayer and, therefore, is allowable in determining the taxpayer's net operating loss for the taxable year. Sec. 1244(d)(3); sec. 1.1244(d)-4(a), Income Tax Regs.
For purposes of this case, it is important to note that after section 1244 stock is issued, any increase in the basis of the stock will not qualify for ordinary loss treatment under section 1244. Sec. 1244(d)(1). Any loss on the stock that is eventually realized must be apportioned between the part of *282 the taxpayer's basis that qualifies as attributable to section 1244 stock and the part that does not. Sec. 1.1244(d)-1(a), Income Tax Regs. Only the portion of the loss allocated to the first part qualifies to be treated as an ordinary loss. Pierce v. Commissioner, T.C. Memo. 1989-647; sec. 1.1244(d)-1(a), Income Tax Regs.
Petitioners claimed on ordinary loss of $ 298,000 from their Empire stock on their joint 1982 Federal income tax return. At the start of trial, petitioners' attorney conceded that the amount shown on the return was wrong and that the amount of the loss was $ 69,000. Petitioners' attorney explained this discrepancy as follows: I realize that on the 1244 the loss which can be utilized is limited to the capital investment, not the capital contributions, so I would be pointing out to the Court here subsequently that the loss taken on the return itself is not the $ 298,000. I believe that the bankruptcy records show something like $ 69,000. * * * I recognize 1244 is limited to the capital contributions buying the stock and that's what we -- the amount will be about 69,000 which is verified, as I said yesterday. When I say "verified" *283 now, I'm saying that with the corporate set showing the ownership and the filing of bankruptcy under Chapter 11, the conversion from Chapter 11 to Chapter 7, the dismissal of the Chapter 7, and showing the amount of the capital investment, we have that area covered. The only area not to be covered is whether or not this $ 68,000, because $ 1,000 utilized on their return for 1982, whether or not that would be available -- whether it was ever utilized.
After hearing argument on all other issues in this case, the Court held a second trial, specifically to dispense with the section 1244 question. At that second trial, petitioners took the position that their basis in Empire stock was $ 92,000. They introduced into evidence five deposit slips from Empire's account at Manufacturers Hanover, three deposit slips from Empire's account at Chemical Bank, and one check drawn on JMS's account at Manufacturer's Hanover, totaling $ 92,281.22, to substantiate that amount. The date and amount of each of those contributions are as follows: 06/12/80
$ 10,000.00
08/04/80
9,281.22
10/02/80
8,000.00
11/12/80
10,000.00
12/04/80
10,000.00
02/01/81
10,000.00
03/30/81
15,000.00
04/01/81
10,000.00
06/05/81
10,000.00
Total  92,281.22
*284 We have difficulty accepting any of these documents as evidence of petitioners' purchase of stock in Empire. Each of the deposit slips contains the words "loan to business JG", except the deposit slip dated June 6, 1981, which states, "Loan to Business M. Grossman". The JMS check dated June 12, 1980, bears the words "security deposit." In their post-trial brief, petitioners once again changed the amount of the loss they claim to have sustained to $ 77,281.22. Petitioners' brief describes the reason for the change as follows: During the course of the [second] trial * * * petitioners' counsel informed the Court that petitioners were claiming their investment in Empire to be in the amount of $ 92,281. This would have included an amount of $ 15,000 which appears in the cash receipts account (Ex. 66) under date of March 30, 1981. However, in preparing this brief it has not been possible to reconcile this item with the paid-in-capital account (Ex. 67). It has, therefore, been decided to reduce the amount of the claim for capital investment, for purposes of this brief, to the sum of $ 77,281, the total of the larger amounts which appear on exhibit 67. Since $ 1,000 of this amount *285 was absorbed on the 1982 return (Ex. 64) the amount cclaimed [sic] as a carryback is being set at $ 76,281.
Petitioners attempt to explain the fact that Mrs. Grossman earmarked the above deposits as "loans to business" because she "was not an experienced bookkeeper" and "did not know the difference between invested capital and loans or advances." Petitioners note that Mrs. Grossman used the word "shares" in Empire's "disbursements and receipts" journal. However, our review of that document fails to substantiate petitioners' position. As we read it, Empire's disbursements and receipts journal suggests that petitioners paid $ 47,281.22 for Empire "shares". An extract of the entries in Empire's disbursements and receipts journal is as follows: Empire's Disbursements and Receipts Journal
08/04/80
J. Grossman
Shares JG
$ 9,281.22
--   10/02/80
J. Grossman
Shares
8,000.00
--   11/12/80
J. Grossman
Shares
10,000.00
--   12/05/80
Transfer from savings
Savings account
--   $ 10,000.00
01/16/81
J. Grossman
Loan JG
--   $ 10,000.00
02/02/81
Manu Savings
Savings
--   10,000.00
02/27/81
J. Grossman
Loan-JG
--   125.00
03/02/81
J. Grossman
Loan-JG
--   1,200.00
05/04/81
Chem Bank
Chem
--   617.98
05/20/81
Just Me
Loan- Just Me
--   150.00
05/20/81
J Grossman
Loan JG
--   300.00
06/05/81
M. Grossman
Shares
10,000.00
--   05/31/81
Chem Bank
Notes payable
--   60,000.00
03/30/81
Manu Savings
Savings acct.
--   15,000.00
04/20/81
Just Me
Loan- Just Me
--   3,000.00
04/27/81
Various
06/05/81
M.G. (stock)
10,000.00
47,281.22
*286 Similarly, petitioners introduced into evidence the page of a ledger account entitled: "Paid-in Capital J.G. & M.G.". That document suggests that petitioners contributed capital of $ 82,625.90 to Empire, but it does not prove how much, if any, stock was issued to petitioners. The entries on the ledger account are as follows: 06/12/80
$ 10,000.00
08/31/80
9,281.22
10/31/80
8,000.00
12/31/80
10,000.00
01/31/81
10,000.00
01/31/81
190.49
02/27/81
10,000.00
03/31/81
125.00
03/31/81
1,200.00
04/01/81
10,000.00
05/31/81
300.00
06/30/81
10,000.00
06/30/81
3,529.19
Total  82,625.90
It is readily apparent that each of the documents on which petitioners rely to prove their basis in the stock of Empire identifies different amounts as petitioners' contributions to Empire's capital and some of the documents contradict petitioners' position that the amounts were contributions to capital, as opposed to loans. Even if we were able to resolve or disregard those problems, an equally serious problem remains. That is, none of the documents on which petitioners rely prove that any shares of stock were actually issued by Empire in return for any of the capital contributions *287 petitioners claim to have made. Petitioners bear the burden of proving that they are entitled to an ordinary loss under section 1244(a) from their Empire stock. Rule 142(a). An element of the definition of the term "section 1244 stock" is the requirement that "such stock was issued by * * * [a small business corporation] for money or other property (other than stock and securities)". Sec. 1244(c)(1)(B). As discussed above, if a taxpayer contributes capital to a small business corporation and does not receive stock in return, the amount of that capital contribution is treated as allocable to stock that is not section 1244 stock, and it is not eligible to be treated as an ordinary loss under section 1244(a) in the event that the taxpayer realizes a loss on the investment. Sec. 1244(d)(1)(B). Thus, petitioners must prove not only the amount of money and property they contributed to Empire's capital, but also that they received Empire stock in return for each contribution to Empire's capital. In this case, even if we were to accept petitioners' allegation that they made eight contributions to Empire's capital totaling $ 77,281, there is no evidence that Empire issued stock to *288 petitioners in the case of each of those contributions. Accordingly, we find that petitioners have not proven that they are entitled to treat any amount as an ordinary loss under section 1244(a) when their stock in Empire became worthless in 1982. Fraud Additions
Respondent determined that petitioners are liable for additions to tax for fraud under section 6653(b) for each of the years at issue. Section 6653(b) provides an addition to tax equal to 50 percent of the underpayment if any part of the underpayment is due to fraud. The Commissioner bears the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). The Commissioner cannot, however, discharge the Government's burden of proving fraud by pointing to the existence of a deficiency that arose by virtue of the fact that the taxpayer failed to carry his burden of disproving the Commissioner's determination. Estate of Beck v. Commissioner, 56 T.C. 297, 363 (1971). Rather, the Commissioner must show by clear and convincing evidence that the taxpayer intended to evade taxes known to be owing, by conduct designed to conceal, mislead, or otherwise prevent the collection *289 of such taxes by respondent. Patton v. Commissioner, 799 F.2d 166, 171 (5th Cir. 1986), affg. T.C. Memo. 1985-148; Recklitis v. Commissioner, 91 T.C. 874, 909 (1988). The existence of fraud is a question of fact decided on the basis of an examination of the entire record. Grosshandler v. Commissioner, 75 T.C. 1, 19 (1980). It may never be presumed but must be established by affirmative evidence. Beaver v. Commissioner, 55 T.C. 85, 92 (1970). However, because direct proof of a taxpayer's intent is rarely available, fraud may be established by circumstantial evidence. Grosshandler v. Commissioner, supra at 19; Gajewski v. Commissioner, 67 T.C. 181, 200 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Respondent argues that the following five badges of fraud are present in this case: (1) Substantial understatement of income for several years; (2) concealment of funds and assets; (3) use of cash; (4) failure to maintain *290 adequate books and records; and (5) use of JMS as a vehicle for deducting personal expenses. In the case of 1978, we have found that petitioners received taxable income of $ 31,093.76, of which only $ 13,272 was reported on their 1978 return. Accordingly, we held earlier in this opinion that petitioners underreported their taxable income for 1978 by $ 17,821.76. In arriving at that conclusion, we found that petitioners had failed to prove their contentions that the unreported income is attributable to transfers of cash from their safe deposit boxes or is attributable to nontaxable proceeds realized from the settlement of their lawsuit involving the Jupiter Ocean, Racquet and Swim Club, Inc., in the amount of $ 17,275.77. We are not satisfied, however, that respondent has met the Government's burden of proving that any part of the underpayment in 1978 was due to fraud. While, as stated above, petitioners failed to prove their allegations that the source of the unreported income in that year is cash held in petitioners' safe deposit boxes, respondent did not disprove those allegations. In fact, respondent concedes that petitioners maintained cash in safe deposit boxes during the *291 years in issue and that the balance of cash in Mrs. Grossman's safe deposit box decreased by approximately $ 45,000 during the year. In the case of 1979, we redetermined a deficiency in petitioner's tax attributable to dividends from JMS in the amount of $ 38,411 and a dividend from Flomar in the amount of $ 9,000. We found that petitioners failed to prove their contention that the dividends from JMS were repayments of loans or advances. Similarly, we rejected petitioners' contention that they received no dividend from Flomar. There is evidence in the record, however, to support petitioners' contentions regarding the dividends from both of these corporations. For example, the 1979 cash receipts and disbursements journal of JMS records payments to Mrs. Grossman in the amount of $ 9,100 as "return of loan". Similarly, there are deposit slips of a greater amount on which the notation "loan to business" is made. In the case of the Flomar dividend, there are documents to suggest that petitioners had business dealings with the Kadens, and there is evidence that petitioners issued personal checks to pay for expenses attributable to the condominium owned by Flomar. We agree with respondent *292 that there are suspicious aspects of petitioners' business dealings. Like respondent, we are given pause by the amount of cash held by petitioners in safe deposit boxes when, at the same time, they maintained bank accounts and transacted other business by check. We are not convinced, however, that taking the facts as a whole, respondent has proven that any part of the underpayment in 1979 was due to fraud. Unlike respondent, we believe that petitioners made an unschooled attempt to keep records on behalf of JMS. For example, Mrs. Grossman maintained cash receipts and disbursements journals during 1979 and 1980 on behalf of the corporation. Further, the expenditures made by JMS on petitioners' behalf in 1979 are recorded as personal expenditures in JMS' cash receipts and disbursements journal for 1979. Respondent's agent used that journal as the principal basis for his adjustments to petitioners' income for the year. Additionally, we do not think that petitioners' failure to cause JMS to file corporate tax returns, standing alone, establishes fraud in this case. See Castillo v. Commissioner, 84 T.C. 405, 409 (1985). In the case of 1980, we determined *293 that there is no tax deficiency for that year. Accordingly, there can be no fraud addition for that year. For the foregoing reasons, Decision will be entered under Rule 155.